# SUPREME COURT OF THE UNITED STATES

### CHARLES C. MCCRORY *v.* ALABAMA

ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
CRIMINAL APPEALS OF ALABAMA

No. 23–6232.    Decided July 2, 2024

The petition for a writ of certiorari is denied.

Statement of JUSTICE SOTOMAYOR respecting the denial of certiorari.

What should a court do when faced with a 40-year-old conviction resting on science that has now been wholly discredited? A court has a variety of tools to test the reliability of forensic evidence introduced in criminal trials today. Yet when a court must look backward, to convictions resting on forensic evidence later repudiated by the scientific community, those tools may fail.

This petition raises difficult questions about the adequacy of current postconviction remedies to correct a conviction secured by what we now know was faulty science. One in four people exonerated since 1989 were wrongfully convicted based on false or misleading forensic evidence introduced at their trials.[1] Hundreds if not thousands of innocent people may currently be incarcerated despite a modern consensus that the central piece of evidence at their trials lacked any scientific basis.

Petitioner Charles M. McCrory was convicted of murder in 1985 based on forensic bitemark testimony that has now been roundly condemned by the scientific community and retracted by the expert who introduced it at his trial.

---

[1] Since 1989, 3,545 people have been exonerated, meaning they were wrongly convicted of a crime. See Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx. Of these wrongful convictions, over 1,000 rested in part on forensic evidence now known to have been false or misleading. See *ibid.*

McCrory argues to this Court that this now-discredited forensic evidence rendered his trial fundamentally unfair in violation of the Due Process Clause. Even if that were true, McCrory faces many procedural hurdles that could delay or even preclude relief based on existing state and federal postconviction statutes. I vote to deny this petition because due process claims like McCrory's have yet to percolate sufficiently through the federal courts. Legislatures concerned with wrongful convictions based on faulty science, however, need not wait for this Court to address a constitutional remedy. Several States have already tackled this troubling problem through targeted postconviction statutes. These statutes create an efficient avenue for innocent people convicted based on forensic science that the scientific community has now largely repudiated.

## I

### A

The wholesale reevaluation of forensic evidence began in 2005, when Congress instructed the National Academy of Sciences to investigate the state of forensic science. The Academy responded four years later with a groundbreaking 314-page report that strongly suggested many forms of forensic evidence that previously had been accepted by courts were, in fact, scientifically unsound. See National Research Council, Strengthening Forensic Science in the United States: A Path Forward (2009) (NAS Report). It found that "no forensic method other than nuclear DNA analysis has been rigorously shown to have the capacity to consistently and with a high degree of certainty support conclusions . . . 'matching' . . . an unknown item of evidence to a specific known source." *Id.*, at 87.

The NAS Report singled out disciplines based on an expert's subjective interpretation (as opposed to analysis in a laboratory). Among those disciplines singled out for critique were bitemark analysis, microscopic hair analysis,

fingerprint analysis, shoe print comparisons, toolmark and firearms examination, and handwriting comparisons.[2]  For instance, the NAS Report found "no evidence of an existing scientific basis for identifying an individual to the exclusion of all others" via bitemark evidence, *id*., at 176, and "no scientific support for the use of hair comparisons" to match a sample to a suspect "in the absence of nuclear DNA," *id*., at 161.  It emphasized that courts failed meaningfully to test the reliability of such evidence.  Instead, they "'routinely affirm[ed] admissibility'" of even "'the most vulnerable forensic sciences—hair microscopy, bite marks, and handwriting,'" relying on "'earlier decisions rather than facts established at a hearing.'"  *Id*., at 107.

Since the NAS Report, the scientific community has shored up some methods of forensic evidence and left others behind.  For instance, a 2016 report to the President from his Council of Advisors on Science and Technology evaluated which of the methods critiqued in the NAS Report had, after further efforts by the scientific community, become "foundationally valid and reliable" enough for use in courts. Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods 67 (Sept. 2016) (PCAST Report).  For instance, the PCAST Report concluded that "latent fingerprint analysis is a foundationally valid subjective methodology" based on two recent studies,

───────────

[2] The scientific community's reevaluation of expert evidence is not limited to these types of forensic analysis.  For example, there is now significant doubt in the medical community over the validity of "Shaken Baby Syndrome," or SBS, an expert diagnosis that formed the basis for convicting caregivers of murder when babies died suddenly under their care. See, *e.g.*, *Cavazos* v. *Smith*, 565 U. S. 1, 13 (2011) (Ginsburg, J., dissenting) (collecting studies questioning the validity of SBS in one such case). The National Registry of Exonerations includes over 30 cases where people convicted of murder, manslaughter, or child abuse based partially on evidence of SBS were later exonerated.  See https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx.

but emphasized that such evidence in court had to be "accompanied by accurate information about limitations on the reliability of the conclusion." *Id.*, at 101; see *id.*, at 148–149. In contrast, it maintained that "bitemark analysis does not meet the scientific standards for foundational validity, and is far from meeting such standards." *Id.*, at 87, 148. The PCAST Report found the "prospects of developing bitemark analysis into a scientifically valid method to be low." *Id.*, at 87.

B

The facts of this petition illustrate some of the problems for courts evaluating this evolving landscape of forensic evidence. McCrory was convicted of killing his wife in 1985. The State's argument centered on the bitemark testimony of celebrity forensic odontologist Dr. Richard Souviron, who gained notoriety after his expert testimony helped secure Ted Bundy's conviction in 1979. Dr. Souviron testified that alleged bitemarks on the victim had been made at or about the time of death and were consistent with dental impressions taken from McCrory. The jury convicted.

In 2002, McCrory filed his first petition for state postconviction review based in part on the unreliability of the bitemark evidence. He cited a 2001 Newsweek article where Dr. Souviron had stated that "'You cannot make a positive ID from a bitemark.'" Brief in Opposition 10. The state court dismissed McCrory's petition and he did not appeal.

In 2020, 35 years after his trial, McCrory filed a second petition for state postconviction review. He argued that "[n]ewly discovered material facts," namely the scientific consensus rejecting bitemark evidence, entitled him to a new trial under Alabama's postconviction scheme. Ala. Rule Crim. Proc. 32.1(e) (2024). Dr. Souviron submitted an affidavit stating that "[u]nder today's scientific consensus

and the changes in the [American Board of Forensic Odontology] Guidelines, it would be unreliable and scientifically unsupported for me or any forensic odontologist to offer individualization testimony that Mr. McCrory was the source of the teeth marks, as I testified in 1985. I therefore fully recant my testimony that 'these teeth marks [were] made by Charles McCrory.'" 1 Record 38.

The state postconviction court held an evidentiary hearing. Two forensic dentists traveled to testify, without compensation, because they both once believed that bitemark evidence could be probative and now understood that it was not. Both experts testified that, based on today's scientific understanding, the victim's injury was "not a human bite mark." Tr. 34 (Apr. 28, 2021); *id.*, at 81. In response, the State introduced the trial transcript.

The court denied McCrory's petition for two reasons. First, the court reasoned that because Dr. Souviron complied with the standards in place at the time of the crime, investigation, and trial, the new testimony by forensic dentists could be construed as impeachment testimony. Second, the court held that there was enough circumstantial evidence of McCrory's guilt at trial outside of Dr. Souviron's testimony that the jury still would likely have convicted. The court included the mold of McCrory's teeth in this evidence, reasoning that the jury could have made the physical comparison from this mold to the mark on the victim's arm themselves.[3] The Alabama Court of Criminal Appeals affirmed.[4]

———————

[3] Alabama does not appear to defend the postconviction court's materiality analysis before this Court, instead pointing to other circumstantial evidence to support the outcome. Indeed, it is difficult to see how McCrory's dental impressions could have been introduced absent any expert testimony on bitemark analysis.

[4] The Alabama Court of Criminal Appeals granted McCrory's motion for rehearing after he raised the fact that Judge Kellum had authored the State's brief against him on direct appeal as assistant attorney general in 1986. Judge Kellum recused herself from the case on rehearing

McCrory has consistently maintained his innocence. He rejected the State's offer to plead to time served before the evidentiary hearing on the bitemark testimony. Now, McCrory asks this Court for relief.

## II

In his petition for certiorari, McCrory argues that the expert bitemark testimony at his trial, now fully recanted and repudiated by the scientific community, rendered that trial unconstitutional. To the Alabama courts, however, McCrory argued primarily that Alabama law entitled him to relief under Alabama Rule of Criminal Procedure 32.1(e), which permits courts to vacate convictions based on "[n]ewly discovered material facts." His constitutional claim formed only a small part of his petition under Alabama law's separate provision that permits relief when the "[c]onstitution of the United States or of the State of Alabama requires a new trial." Rule 32.1(a). Both the trial court and the Alabama Court of Criminal Appeals summarily dismissed McCrory's constitutional claim. McCrory does not appear yet to have sought habeas review of his conviction in federal court. Even with a case like McCrory's, however, where the science underlying the expert evidence at his trial has been fully repudiated by the scientific community and fully recanted by the expert himself, ordinary state and federal avenues for postconviction relief can present significant barriers.

## A

Many States have postconviction statutes like Alabama's that allow relief based on "[n]ewly discovered material facts." Rule 32.1(e). Typically, however, these statutes cover evidence that the defendant or his counsel could have but did not know about at the time of trial. For instance,

_____

and the court published an opinion identical to its previous one, except for noting her recusal.

Alabama's statute requires that "[t]he facts relied upon were not known by the petitioner or the petitioner's counsel at the time of trial or sentencing or in time to file a posttrial motion . . . or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence." Rule 32.1(e)(1). Of course, counsel would have no way of knowing that forensic evidence offered at the time of trial would be discredited decades later. Yet defendants convicted based on forensic evidence that has now been firmly discredited can still struggle to meet the requirements of such statutes in three ways.

First, because science evolves slowly rather than in conclusive bursts, it can be hard to pinpoint when someone should have "discovered [newly-discrediting evidence] through the exercise of reasonable diligence." *Ibid.* Unlike a murder weapon left in an abandoned warehouse, forensic science does not lie around waiting for sudden discovery. State postconviction schemes may also bar claims raised previously, even if the repudiation of the relevant science was in a more nascent stage. That can harm diligent defendants who may have had previous postconviction petitions denied when the expert testimony underlying their conviction had merely been called into question, but not yet conclusively repudiated by the scientific community. See A. Maxfield & N. Sanghvi, Junk Statute: How Post-Conviction Statutes Fail Petitioners Convicted Based on False or Misleading Forensic Evidence, 75 Rutgers L. Rev. 1343, 1356–1357 (2023) (detailing these challenges under Pennsylvania's postconviction review statute). For instance, McCrory filed a petition in 2002 based on a statement from Dr. Souviron in a 2001 Newsweek article several years before the NAS Report and well before the scientific consensus repudiating bitemark testimony.

Second, States may bar or discount new evidence that merely calls into question the probative value of evidence

presented at trial. In McCrory's case, both lower courts held that the new evidence "merely amount[ed] to impeachment evidence," Rule 32.1(e)(3); in other words, it would merely have given the jury reason to disbelieve the expert's evaluation of the evidence. Evidence that an entire mode of forensic analysis has no scientific basis, however, is of a different category from evidence that might call into question a witness's credibility or motive to testify. State postconviction statutes may not account for this difference.

Third, newly-discredited forensic evidence is different from other newly-discovered facts. Unlike a new witness to a murder or a new analysis of DNA evidence, the new evidence is simply a scientific consensus that the old evidence was unreliable. In McCrory's case, for example, it is not that the dental mold was not of McCrory's teeth or that the victim had no marks on her arm. It is simply that a modern scientist would be unable to testify that the two had anything to do with each other. State courts, however, sometimes decline to find that changed science is new evidence that requires a new trial. See J. Laurin, Criminal Law's Science Lag: How Criminal Justice Meets Changed Scientific Understanding, 93 Texas L. Rev. 1751, 1763–1764, and nn. 70–72 (2015) (collecting cases where state courts have held that changed science evidence is merely cumulative of other evidence or fails to point affirmatively to innocence).

Even when there is no question that the current scientific consensus would bar the admission of expert testimony in a trial today, state courts may still struggle to apply existing postconviction statutes to provide relief.

B

Modern trial courts have many tools to ensure the reliability of expert forensic testimony. See, *e.g.*, *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993); *Smith* v. *Arizona*, 602 U. S. ___ (2024). Many commenta-

tors, however, have emphasized the challenges in remedying defects in state convictions through federal postconviction review after the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See, *e.g.*, L. Kovarsky, Structural Change in State Postconviction Review, 93 Notre Dame L. Rev. 443, 461–465 (2017) (cataloging how AEDPA shifts primary responsibility for error correction from federal to state postconviction proceedings). AEDPA's overwhelming concern with the finality of criminal convictions sits uneasily with modern scientific developments that call those convictions into question.

Even beyond these structural barriers to federal postconviction review, prisoners may face substantive challenges with how to fit newly-discredited science into existing constitutional doctrines. See, *e.g.*, C. Plummer & I. Syed, Criminal Procedure v. Scientific Progress: The Challenging Path to Post-Conviction Relief in Cases That Arise During Periods of Shifts in Science, 41 Vt. L. Rev. 279, 287 (2016) (describing why someone whose conviction relied on discredited forensic testimony "may well be considered indisputably innocent by today's standards, but have no apparent legal avenue for relief"). McCrory's constitutional argument formed only a small part of his submissions to the Alabama courts and has yet to be passed on by a federal court. In this Court, he argues that a conviction "based on expert testimony that later is completely eliminated from the case" renders the underlying trial fundamentally unfair under the Due Process Clause. Pet. for Cert. 26. This Court has held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue* v. *Illinois*, 360 U. S. 264, 269 (1959); see also *Escobar* v. *Texas*, 598 U. S. \_\_\_ (2023) (vacating and remanding based on Texas's confession of error about a faulty crime laboratory). With newly-discredited expert evidence, however, nobody knew that the evidence was faulty at the time of the trial.

Similarly, it is hard to argue that trial counsel was ineffective for failing to object to science that was discredited only decades after the initial trial.

Of course, none of this prevents federal courts from holding that the lack of any direct evidence of a defendant's guilt aside from discredited expert testimony rendered a trial fundamentally unfair. See *Spencer* v. *Texas*, 385 U. S. 554, 563–564 (1967) ("[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial"); *Chambers* v. *Mississippi*, 410 U. S. 284, 302 (1973) (holding that "the exclusion of . . . critical evidence . . . denied [the defendant] a trial in accord with traditional and fundamental standards of due process"); see also, *e.g.*, *Han Tak Lee* v. *Houtzdale SCI*, 798 F. 3d 159, 169 (CA3 2015) (affirming grant of habeas relief after State failed to point to "'ample evidence'" sufficient to prove guilt beyond a reasonable doubt after excluding discredited fire-science evidence); *Gimenez* v. *Ochoa*, 821 F. 3d 1136, 1145 (CA9 2016) (recognizing "that habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence 'undermined the fundamental fairness of the entire trial'"). Although AEDPA review can be a backstop on the constitutional rights of criminal defendants, legislatures remain free to address this known flaw with decades-old convictions more directly.

### III

Rather than waiting for this Court to address discredited forensic evidence testimony via constitutional law, Congress and state legislatures can more efficiently address this known problem in the first instance. Indeed, at least six States have already taken action.[5]

──────────

[5] See Tex. Code Crim. Proc. Ann., Art. 11.073 (Vernon 2015); Cal. Penal Code Ann. §1473(e)(1) (West 2023); Conn. Gen. Stat. §52–582 (2018); Wyo. Stat. Ann. §7–12–402(a)(iv) (2018); Mich. Ct. Rule 6.502(G)(2)–(3)

Statement of SOTOMAYOR, J.

Texas led the way in forensic science reform in criminal procedure. In 2013, Texas passed the first statute that allowed prisoners to challenge wrongful convictions by showing that changes in forensic science seriously undermined the integrity of their criminal trials. Article 11.073 applies to "relevant scientific evidence that . . . contradicts scientific evidence relied on by the state at trial." Art. 11.073(a)(2). If a court finds that such scientific evidence was not available at the time of the trial, would have been admissible, and, if presented at trial, "on the preponderance of the evidence" would have changed the outcome, it can grant relief. Art. 11.073(b)(2).

In 2018, the Texas Court of Criminal Appeals applied the new statute to bitemark evidence from Steven Chaney's 1987 murder trial. State experts at Chaney's trial had testified that a mark on one victim's arm was a "'match'" to Chaney. *Ex parte Chaney*, 563 S. W. 3d 239, 260. The court held that the "body of scientific knowledge underlying the field of bitemark comparisons has evolved since [Chaney's] trial in a way that contradicts the scientific evidence relied on by the State at trial." *Ibid.* "New peer-reviewed studies discredit[ed] nearly all the testimony" about the mark "being a 'match,'" and the American Board of Forensic Odontology "has completely disavowed individualization (i.e., that Chaney was a 'match'), which the State heavily relied upon at Chaney's trial." *Id.*, at 260–261. The court concluded that the bitemark evidence was the "linchpin of the State's case"; its "remaining evidence was circumstantial and weak." *Id.*, at 262. Chaney had therefore "shown by a preponderance of the evidence that he would not have been found guilty if the newly available and relevant scientific evidence he now relies upon had been presented at his 1987 trial." *Id.*, at 263.

California has followed a similar trajectory. In 2014, it

―――――――
(2023); Nev. Rev. Stat. §34.930(3) (2019).

revised its postconviction statute's definition of "false evidence" to "includ[e] opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by the state of scientific knowledge or later scientific research or technological advances." Cal. Penal Code Ann. §1473(e)(1) (West 2023).[6] In 2016, the California Supreme Court applied the revised statute to bitemark testimony from William Richards' 1997 trial for the murder of his wife. The court had previously denied Richards' postconviction challenge based on the expert's recantation of his bitemark testimony under the then-extant "false evidence" statute. See *In re Richards*, 55 Cal. 4th 948, 289 P. 3d 860 (2012). Under the new definition in California's postconviction statute, however, the court concluded that the bitemark evidence was now "false evidence" that could form the basis of postconviction relief. *In re Richards*, 63 Cal. 4th 291, 311, 371 P. 3d 195, 209 (2016). Concluding that, "with the exception of the bite mark evidence, the defense had a substantial response to much of the prosecution's evidence" and it was therefore "reasonably probable that the false evidence presented by [the expert] at [Richards'] 1997 jury trial affected the outcome of that proceeding," the court granted Richards relief. *Id.*, at 315, 371 P. 3d, at 211.

These cases in Texas and California show how targeted legislative reform can allow courts to address convictions based on trial evidence that has been repudiated by the scientific community. Legislators enabled these courts explicitly to consider changes in forensic science on collateral review of criminal convictions. "The adoption of these changed science writs empowers courts in state habeas proceedings to reverse wrongful convictions, rather than be hindered by procedure." V. Beety, Changed Science Writs

_____

[6] This provision is now codified elsewhere in section §1473. See Cal. Penal Code Ann. §1473(b)(2) (West 2024).

and State Habeas Relief, 57 Hous. L. Rev. 483, 531 (2020). As a result, innocent people can attain freedom sooner.

\*　　\*　　\*

I vote to deny this petition because the constitutional question McCrory raises has not yet percolated sufficiently in the lower courts to merit this Court's review. There is no reason, however, for state legislatures or Congress to wait for this Court before addressing wrongful convictions that rest on repudiated forensic testimony.