Filed 5/26/16

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |
|---|---|
| ) | |
| ) | S223651 |
| In re WILLIAM RICHARDS ) | |
| ) | Ct.App. 4/2 E049135 |
| on Habeas Corpus. ) | |
| ) | San Bernardino County |
| ) | Super. Ct. No. SWHSS700444 |
| _____) | |

In 1997, petitioner William Richards was convicted of the 1993 murder of his wife, Pamela. In 2012, by a 4 to 3 decision, this court rejected his claim on habeas corpus that his conviction should be overturned because the prosecution's dental expert had recanted his expert opinion testimony at trial that a lesion on Pamela's hand was a human bite mark matching petitioner's unusual teeth. (*In re Richards* (2012) 55 Cal.4th 948 (*Richards I*).) The majority concluded that the expert's recantation did not constitute "false evidence" within the meaning of Penal Code section 1473 as the statute then read[1] because, in the absence of "a generally accepted and relevant advance in the witness's field of expertise" or "a widely accepted new technology" that would allow "experts to reach an objectively more accurate conclusion," petitioner had failed to show, by a preponderance of the evidence, that the expert's opinion at trial was "objectively

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

**PLEASE SEE CONCURRING OPINIONS**

untrue." (*Richards I*, *supra*, 55 Cal.4th at pp. 963, 966.)  In 2014, however, the Legislature responded to our decision in *Richards I* by amending section 1473 to state that " 'false evidence' shall include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." (§ 1473, subd. (e)(1), as added by Stats. 2014, ch. 623, § 1.)

Petitioner has filed a new petition for writ of habeas corpus before this court in which he contends that, under the 2014 legislative revision of section 1473, he is now entitled to relief and that his conviction should be overturned.  For the reasons discussed hereafter, we agree.

## I. STATEMENT OF THE CASE

The San Bernardino County District Attorney charged petitioner with the August 10, 1993, murder (§ 187) of his wife, Pamela Richards.

Petitioner's first two full trials ended in mistrials with hung juries.  A third trial ended in a mistrial because the trial court recused itself during jury selection. In petitioner's fourth trial, the jury announced it was deadlocked; it then received further instruction concerning reasonable doubt, after which the jury returned a conviction of first degree murder.  The trial court sentenced petitioner to 25 years to life, and his conviction was affirmed on appeal in August 2000.

In 2007, petitioner filed a petition for writ of habeas corpus in the San Bernardino County Superior Court, asserting that his 1997 murder conviction was based on false evidence and that new evidence unerringly established his innocence.  The superior court issued an order to show cause and subsequently held an evidentiary hearing in 2009.  At the conclusion of that hearing, the superior court granted the petition and vacated petitioner's judgment of conviction.

The prosecution appealed, and the Court of Appeal reversed in November 2010. We granted review, and, as noted above, affirmed the Court of Appeal judgment by a 4 to 3 vote on December 3, 2012. (*Richards I*, *supra*, 55 Cal.4th 948.)

Following the Legislature's 2014 amendment to section 1473, petitioner filed the present petition for writ of habeas corpus. We issued an order to show cause returnable before this court, and respondents, the Department of Corrections and Rehabilitation and the warden of the California facility at which petitioner is incarcerated, represented by the San Bernardino County District Attorney, have filed a return in opposition to the petition.[2]

## II. PETITIONER'S JURY TRIAL

The following evidence was presented at petitioner's 1997 jury trial.

### A. Petitioner's relationship with his wife

Petitioner and his wife, Pamela, lived on a remote property they owned in the Mojave Desert in San Bernardino County. The plot had a small house and a camper parked nearby. They used a generator, kept in a small, fenced shed, for electricity. To access their home, one had to ascend a steep, sand-and-gravel driveway. The couple kept several dogs on the property to ward off intruders.

---

[2] In their return, respondents do not dispute petitioner's reliance on the record of the 2009 habeas corpus evidentiary hearing to support the claims raised in the present petition. Although we are not aware of any previous habeas corpus proceeding presenting a comparable procedural history and setting, in the absence of any contention that the testimony at the prior evidentiary hearing does not provide a proper basis for resolving the issues presented in the present habeas corpus petition, we shall resolve the petition on that basis. Because of the change in the applicable law concerning the definition of false evidence, the petition is not subject to the procedural bar of successiveness. (*In re Clark* (1993) 5 Cal.4th 750, 767.)

Petitioner and his wife had been having financial and marital difficulties, and both had sexual relationships outside the marriage. At the time of her death Pamela had been having a sexual relationship with Eugene Price, whom she had helped to recover from a helicopter accident. Pamela planned to leave petitioner and find an apartment with Price.

## B. The night of August 10, 1993

On the night of her death, August 10, 1993, petitioner was working a night shift. Price received a message from Pamela on his answering machine sometime between 7:00 and 7:30 p.m. At approximately, 9:30 p.m., Price tried calling Pamela at the camper but received a busy signal. Price continued to try to call Pamela, calling approximately every five minutes, but he continued to receive a busy signal. Because of past problems with the telephone service in that area, Price contacted the phone company to check the line. Price continued to call Pamela, but without success.

At approximately 11:55 p.m., Price telephoned Pamela again, but this time petitioner answered. He sounded stressed and agitated. When Price asked for Pamela, petitioner said she was dead — and he told Price that her head was bashed in and her eye was hanging out of its socket. Price told petitioner to call 911.

At 11:58 p.m., petitioner called 911. In that call, petitioner stated he had just come home and discovered his wife was dead. He said he thought Pamela fell off the porch steps and hit her head.

Petitioner placed a second call to 911 at 12:06 a.m. In that call, petitioner asked when responders would arrive. He said that he thought that she had fallen, but that "things don't look right here at all," that "there's things moved," and that they should send someone who could examine the scene. The 911 operator assured petitioner that dispatch would send someone who could examine the scene

4

and advised petitioner not to touch anything. Petitioner responded that he had not touched anything but the phone and the door and that he had rolled Pamela's body over to see if she was all right.

Petitioner placed a third call to 911 at 12:33a.m. In that call, he again asked when responders would arrive. He also stated that, when he went to start the generator, he observed blood and Pamela's pants in that area and saw there was blood inside the camper. He stated his belief that Pamela had been attacked and killed near the generator because oil had been spilled there as well. Petitioner expressed anger as to why responders had not yet arrived. The dispatcher repeatedly advised petitioner not to touch anything and suggested he go sit in his car. Petitioner said he had not touched anything and that he would go sit with Pamela.

San Bernardino County Sheriff's Deputy Mark Nourse arrived at the scene shortly after 12:30 a.m. The sky was overcast and the property was dark, with no light source. Deputy Nourse used his patrol vehicle lights and his flashlight to illuminate the scene.

Petitioner led Deputy Nourse to Pamela's body; the couple's dogs acted aggressively toward Deputy Nourse as he approached. According to Deputy Nourse, it appeared that part of Pamela's skull had been gouged out by some kind of blunt object and that pieces of her skull were nearby. One of her eyes was gouged out and an ear partially ripped off. Deputy Nourse could not detect a pulse. The body was neither warm nor cold. Her arm was pliable. Her blood was still wet, bright red, and puddled; it had not coagulated or soaked into the sandy soil. Based on his prior experience as a trained emergency medical technician and as a first responder firefighter, Deputy Nourse believed she had very recently died.

Petitioner began discussing the crime scene with Deputy Nourse. He told the deputy that Pamela was "stone cold dead" and that she must have been dead a

5

long time because the battery in the camper had run out. Petitioner pointed out a cinder block that he said was used to kill her and stated there was also a stepping stone with blood on it. Petitioner gave his scenario concerning how he thought the assault and killing took place, including that he thought the attack had begun near the generator. According to Deputy Nourse, petitioner also said: "It don't matter any, all the evidence that relates to this case I already touched and moved trying to figure out how this whole thing happened." Deputy Nourse described petitioner's demeanor as "very calm, cool, [and] collected," but occasionally petitioner would fall to his knees crying, after which he would get back up and then continue talking. To the deputy, it seemed as if petitioner was speaking "like he had rehearsed or was reading from a script."

Deputy Nourse became suspicious of petitioner and began surreptitiously recording their conversation. During this recording, petitioner explained that when he came home from work around midnight he found his wife lying facedown on the ground with her head against a cinder block. When he rolled her over in the dark, petitioner said that his fingers went into the hole in her head. Petitioner told Deputy Nourse that he initially thought that she had fallen and hit her head on the cinder block, but that he found blood on pillows inside the camper. Petitioner said that "things ain't right here" and expressed anger that Pamela's pants were lying next to the generator. He explained that Pamela "had to squeeze into those jeans" that morning because she had gained weight and that they would not have come off easily, adding, "trust me." Petitioner stated that her underpants were inside the camper. He also stated that Pamela had placed the vacuum cleaner inside the camper and theorized that that she intended to start the generator so she could vacuum but was assaulted near the generator instead. Petitioner showed Deputy Nourse a spilled oil bottle the couple usually used to fill the generator before starting it. He stated that he knew there was "blood on rocks up against the

6

hill," and that there was a bloodstained paving stone that had been thrown "over the side of the hill." Petitioner remarked that his dogs had failed to protect his wife from her killer. He did not report anything missing from the premises. And he surmised that the killer had used a cinder block to kill Pamela.

Deputy Nourse directed petitioner to stay away from the crime scene while they waited for the homicide team to arrive. The homicide detectives did not arrive until 3:15 a.m. Because of the darkness, they decided not to process the crime scene until dawn. They tried but were unable to secure the couple's dogs before leaving.

### C. The crime scene

Detective Norman Parent, Criminalist Dan Gregonis, and Forensic Specialist Valerie Seleska began examining the crime scene at 6:00 a.m.

Approximately 25 feet away from Pamela's body, near the small shed for the generator, there were bloodstains on the ground, on a gasoline container, and a bloodied rock, along with one of Pamela's shoes. One of Pamela's broken fingernails was also found in this area. In front of the generator was Pamela's other shoe, her jeans, and a spilled bottle of oil. There was also blood spatter on the fencing surrounding the shed for the generator.

The team found Pamela's body lying on its back, covered with a sleeping bag, on the ground between the camper and the house's porch. Her right arm lay upon some heavy, metal-grate fencing material that lay flattened on the ground. She was naked from the waist down, except for socks. Her tank top had numerous bloodstains and blood spatter. Her head was crushed, an eye was hanging out, and a large pool of blood was beside her. The dogs had partially buried her head during the night.

7

A large, bloody cinder block was near her body and a bloody 12-by-12-inch stepping stone was a little further away on the edge of a slope. Based on the blood on them and their proximity to the body, Detective Parent believed that both the cinder block and stepping stone had been used to smash Pamela's head.

The porch nearby had signs of blood spatter on it, as did the side and top of a table cart that was on the other side of her body. Stepping stones leading from the porch to the camper also had obvious blood spatter. The bottom of the entryway into the camper had blood smeared on it.

Inside the camper was a couch with pillows stacked on one end. The pillows had bloodstains on them as well as dirt and small pebbles. Detective Parent believed that Pamela had already been bleeding outside before she bled on the pillows in the camper. There was also a blood smear on a telephone hanging on a wall. A vacuum cleaner stood upright in the middle of the floor, near her underpants, and was plugged in.

Pamela's Suzuki Samurai was parked in front of the camper. On the passenger seat was Pamela's purse, and it contained a letter signed and dated by petitioner nearly one month earlier in which petitioner proposed a division of their assets and personal property.

Detective Parent examined the area for tire tracks and was able to account for tracks left by the patrol vehicles, petitioner's truck, and Pamela's Suzuki. There was no evidence of any other tire tread marks. He also examined the area for shoe prints. He found three prints consistent with Pamela's shoes, and one print consistent with petitioner's shoes, which were very worn, with little tread. Other than these and the prints left by the officers, there were no other shoe prints. However, on several parts of the property, the soil was generally hard packed and not very conducive to retaining prints.

8

### D. Defendant's interviews

Detective Tom Bradford interviewed petitioner for several hours on August 11, 16, and 30, and September 3, 1993. Petitioner's statements in those interviews were generally consistent with what he had told Deputy Nourse at the crime scene. He also stated that he had been home approximately five to 10 minutes before Eugene Price called his home and petitioner told him that Pamela was dead. He explained that he and Pamela kept several guns on their property and that Pamela knew how to use them. Petitioner admitted that he knew Pamela was having sexual encounters with Price because she would tell him about them, which bothered him. He also admitted that he thought Pamela was going to leave him.

### E. Autopsy evidence

Dr. Frank Sheridan, chief medical examiner for the Coroner's Office of San Bernardino County, performed the autopsy on Pamela's body. He determined that Pamela had been strangled, first unsuccessfully by ligature, and then manually. According to Dr. Sheridan, the strangulation was sufficient in itself to cause her death. In addition, the left side of her skull was smashed, which crushed her brain. According to Dr. Sheridan, this injury was also sufficient to cause her death. He believed that the strangulation came first and that Pamela was dead or nearly dead when the blunt force was inflicted because there was very little bleeding or bruising in the area of her skull injury.

Pamela's body had several defensive wounds, and there was bruising across her body, and lacerations and abrasions to her face. There were no signs of sexual assault. However, based on the significant blood spatter on her jeans and the lack of spatter on her bare legs, it appeared that someone had removed her pants after the blunt force was applied to her head.

Dr. Sheridan examined the lividity on the body. Lividity is the deep red-purple discoloration seen on a body after death, which is created when the heart

9

stops beating and the blood settles down into the lowest parts of the body by way of gravity. Lividity becomes fixed on the body after six to 10 hours. According to Dr. Sheridan, if Pamela had died facedown, and stayed in that position for a few hours, but was later turned on her back, he would expect that the blood would drain toward her back, showing lividity there instead. At the crime scene, lividity was present on Pamela's back, consistent with the body's having lain on its back for several hours. However, the lividity was very weak, indicating she had lost a lot of blood as a result of her injuries.

Dr. Sheridan could give no opinion as to the time of death, and no liver temperature was taken when the officers first arrived at the crime scene. At the time, it was not standard practice for the coroner's office to take a body's liver temperature at the crime scene in order to estimate the time of death.

### F. Petitioner's clothing

Detectives collected the clothing that petitioner wore on the night of Pamela's death. They also took pictures of his body and his arms and hands, none of which showed any fresh wounds, injuries, or other visible marks.

Criminalist Gregonis examined petitioner's cotton shirt, jeans, and shoes for blood spatter. He found no blood spatter on petitioner's shirt, but found blood transfer stains on the right collar and sleeve, consistent with petitioner's account of cradling his wife's head at the crime scene. Based on his experiments with a dummy head, however, Gregonis testified that he would have expected to see more blood transferred to petitioner's shirt as a result of cradling a bloodied head, as well as blood dripped onto petitioner's jeans, but the jeans contained no such drip patterns. Petitioner's jeans had three small bloodstains that were consistent with Pamela's blood and appeared to Gregonis to have been deposited as the result

10

of blood spatter.[3]  They were present in the right knee area, the right mid-thigh area, and to the left of the zipper, on the left leg.  Blood consistent with Pamela's was found on both of petitioner's shoes, with blood on the left shoe's toe area and blood spatter on the lacing of the right shoe.

Although he initially expected to find much more blood on petitioner's clothing, Gregonis surmised that the cinder block may have shielded petitioner from significant blood spatter due to its size.

### G.  Other forensic evidence

During the autopsy, Dr. Sheridan severed some of Pamela's fingertips from her body for later testing.  Criminalist Gregonis later examined the severed fingertips under a microscope and noticed blue cotton fibers wedged deep in a crack of a broken fingernail on one of the fingertips.  The microscope was equipped with a video recording device, and Gregonis recorded a video of his extraction of the fibers from the fingernail.  A matching broken fragment apparently torn from the same fingernail was found on the ground at the crime scene, suggesting that the fingernail broke during Pamela's struggle with her assailant.

Gregonis examined the blue cotton shirt petitioner wore on the night of the killing, and he concluded that its blue fibers were indistinguishable from the fibers removed from the crack in Pamela's broken fingernail.  Gregonis, however, also acknowledged that cotton fiber is probably the most common fiber in the world, that blue cotton is common, and that there was nothing particularly unique about petitioner's blue cotton work shirt.

---

[3]    There were other small bloodstains on petitioner's jeans, but they were either consistent with petitioner's blood or were too small to return any DNA tests results.

11

Gregonis examined both the bloody cinder block and the bloody stone. The cinder block had hairs and a significant amount of blood spatter and areas of saturated blood on it, indicating that it was used to smash Pamela's head. Based on the amount of blood also present on the stone, Gregonis believed that it too could have been dropped on or thrown at Pamela's head.

### H. Bite mark evidence

Specialist Valerie Seleska, who photographed the crime scene, also took photographs of Pamela's autopsy. She took a photograph of a crescent-shaped lesion on Pamela's right hand. Seleska acknowledged that if a body exhibited signs of a bite mark, it was standard practice to swab the suspected bite mark to collect any saliva. During the autopsy, she did not see anyone take a swab of the lesion on Pamela's hand.

Ten days before petitioner's final jury trial began in 1997, the San Bernardino County District Attorney's Office contacted Dr. Norman Sperber, a dentist and forensic odontologist, to examine the photograph taken by Seleska at Pamela's autopsy. Dr. Sperber testified that he had over 40 years of experience in dentistry. He explained that he was the chief forensic dentist for two counties — San Diego and Imperial. Dr. Sperber said that he was one of 100 people in the country certified in forensic odontolgly by the American Board of Forensic Odontology. He had received a congressional appointment to set up a national system for identifying persons through dental records. Dr. Sperber had previously qualified as a forensic odontologist in 26 states in more than 100 cases, more than 80 of which involved bite mark evidence. He also described testifying as a forensic odontolgist in the Jeffrey Dahmer case and in the Ted Bundy case, in which he matched a bite mark on one of the victims to Bundy.

12

As described hereafter, in explaining his conclusion that the photograph revealed that the lesion on Pamela's hand was consistent with petitioner's teeth, Dr. Sperber's testimony was composed of a series of opinions and factual observations that integrated various exhibits.

First, Dr. Sperber opined that the lesion on Pamela's hand was a bite mark. Second, he believed that the bite mark was of human origin. Third, Dr. Sperber testified that, based on the overall shape of the human bite mark, it was made from the lower teeth of the human jaw. Fourth, he believed that the human bite mark showed an abnormality — the presence of only one of the two canine teeth of the lower jaw. Fifth, he made a casting of petitioner's teeth, took a photograph of the casting of petitioner's lower jaw, enlarged the photograph of the victim's bite mark to match the proportions of the photo of the lower jaw, drew a tracing of petitioner's teeth on a transparency, and then overlaid that transparency over the enlarged photo of the bite mark. Dr. Sperber then stated that the overlaid transparency made a "pretty good alignment" with the photo of the bite mark.

In addition to his exhibits, Dr. Sperber explained why he believed petitioner's lower teeth were consistent with the lesion on Pamela's hand. According to Dr. Sperber, because one of petitioner's canine teeth was "under-erupted" and crooked, it did not protrude as much as the other teeth on the jaw line, and this circumstance could account for the missing canine mark on Pamela's hand. He described the missing tooth mark as a "common sense expectation" or "common sense understanding" based on petitioner's abnormal canine tooth. He further noted that whoever made the bite mark had something wrong with one of his canine teeth, as did petitioner. Dr. Sperber also noted that petitioner's lower teeth were in an asymmetrical curve, with three teeth lined up straight, whereas a normal jaw would exhibit greater curvature of those teeth. He believed that characteristic was another factor showing a match with the bite mark photo.

13

Dr. Sperber explained that there were no studies in forensic odontology regarding the statistical rarity of an under-erupted canine tooth. When asked, based on his personal experience as a dentist, how often Dr. Sperber had observed an under-erupted canine tooth in his patients, he explained that the under-eruption plus the asymmetry of petitioner's teeth made petitioner's teeth "even more unusual" and that he would expect "one or two or less" out of 100 people to have such features.

Dr. Sperber further explained that he uses four categories to assess bite mark evidence in order of increasing confidence of a match: "not consistent," "consistent," "probable," and "reasonable doubt certainty." Dr. Sperber explained that the angular distortion of the photo of Pamela's lesion prevented his ability to classify his match with any degree of certainty greater than "consistent," meaning that defendant could have left the lesion and could not be ruled out.

## I. Other evidence

The time clock at petitioner's work indicated that he had left there at 11:03 p.m. on the night of the killing. A few weeks after the killing, a sheriff's investigator went to petitioner's place of employment. The investigator left petitioner's workplace at 11:03 p.m., walked to his car in the parking lot, and then left the lot at 11:06 p.m. Although the posted speed limit was 55 miles per hour, the investigator that night was able to drive 75 miles per hour with the flow of traffic for most of the trip to petitioner's property. Forty-one minutes later, he arrived at petitioner's residence at 11:47 p.m.

## J. Defense evidence

Wayne Kozica, Pamela's brother, telephoned and spoke with her at approximately 7:15 to 7:30 p.m. on the night of her death, and she seemed normal

14

at that time. Pamela had told Kozica that she and petitioner had been arguing, and Kozica offered to let her stay with him in San Diego.

Arthur Quas testified that he called petitioner's residence but no one answered. According to Quas, he called just before 10:00 p.m. and the phone rang a few times followed by clicks and then a dial tone. He called again but the phone rang with no response. Quas was aware that petitioner and Pamela were in an open relationship and would have sexual affairs outside the relationship.

On three occasions, Christian Filipiak, a defense investigator, left the parking lot of petitioner's place of employment at 11:06 p.m. and drove, at different speeds, the same route as petitioner did on the night of Pamela's death. Driving with the cruise control set at 60, 65, and 70 miles per hour, it took Filipiak 52 minutes, 48 minutes, and 44 minutes, respectively, to arrive at the residence. The distance was 44.8 miles.

Griffith Thomas, a physician specializing in pathology and forensic pathology, explained that time of death is a complex determination. Factors include rigor mortis, lividity, core body temperature, and environmental conditions. Depending on the ambient temperature, a dead body cools at a rate of 1.5 to 2 degrees Fahrenheit per hour. According to Thomas, the closer to the time of death observations are made, the more accurate the findings will be. Thomas also stated that it was "outrageously wrong" for the investigation team to have waited till the next morning to dispatch a coroner's investigator to examine Pamela's body. As a result, he explained, it cannot be said when death occurred in this case. Thomas also believed that several of the wounds and bruises on Pamela's body had been inflicted several hours before her death because of the advanced coloring of the contusions, which normally takes significant time to develop.

Dr. Gregory S. Golden, a dentist and chief odontologist for San Bernardino County, compared his own models of petitioner's teeth with an enlarged, life-sized photograph similar to the autopsy photograph used by Dr. Sperber. Dr. Golden could not eliminate petitioner as a suspect, but then did further studies, by randomly using dental models of patients he had treated in the past. Out of 15 different dental models of patients he had treated, Dr. Golden found five dental models whose teeth appeared to match the lesion on the photograph. Accordingly, Dr. Golden believed that the bite mark evidence should be disregarded because of the generic nature of the bite and the low quality of the photograph. On cross-examination, however, Dr. Golden also stated that petitioner's under-erupted, displaced canine was "unique" and that "there is a very low probability that you are going to find an individual with a tooth in that position in the same orientation down to maybe two percent of the population, if that."

Dean Gialamas, senior criminalist with the Los Angeles County Sheriff's Department, testified regarding his examination of the bloodstains on petitioner's clothes. Gialamas explained that he had been trained in blood spatter interpretation and has presented papers on the subject. He had received awards from regional and international associations for his achievements in criminalistics. Although he testifies for the prosecution about 75 percent of the time, Gialamas stated that he had been appointed to examine the evidence for the defense in the present case.

Gialamas examined the photographs of the crime scene with special attention to the blood spatter around Pamela's body, noting that the blood had radiated out in numerous directions. He stated that he would have expected to see multiple blood patterns on the person who dropped the cinder block on Pamela's head. In his assessment, Pamela's head suffered at least three blows, based on her

16

wounds and the fact that she had to have sustained an open, bleeding wound for the spattering to be generated.

Gialamas conducted and videotaped multiple experiments in which he dropped a cinder block on a sponge shaped into a dummy head and soaked with human blood. The blood spatter invariably came back toward him in the lower leg to thigh area, despite the cinder block's shielding of some of the spatter. In another experiment, the blood spatter reached as high as his shirt collar. Although he was wearing gloves, the rough edges of the cinder block cut his hand.

Gialamas also conducted experiments using bloodied hair being dragged across the laces of a canvas shoe like the one petitioner wore the night of Pamela's death. The contact transfer of blood from the hair to the shoe created a pattern similar to those found on the laces of petitioner's right shoe, creating a pattern that looked very similar to blood spatter. Gialamas could not rule out either the transfer of blood from hair or blood spatter as the origin of the bloodstains found on the laces of petitioner's right shoe but found it odd that the dots of spatter on petitioner's shoe lined up in a straight row, as opposed to being randomly deposited. Gialamas testified that the bloodstains found on the toe portion of petitioner's left shoe had no characteristics of spatter, but was simply a contact-type transfer stain. Gialamas further believed that the blood pattern on the shoes were inconsistent with the extensive spattering that occurred in his cinder block experiments.

Gialamas also examined the three areas of petitioner's jeans that Gregonis testified had signs of blood spatter. Gialamas concluded the bloodstains on the right knee area were transfer stains consistent with the wearer's kneeling on some kind of blood source, perhaps bloody gravel, because the stains in that area varied in size, shape, and intensity. Regarding the bloodstain found on the right upper thigh, Giamalas testified that the stain looked more like a transfer stain, but could

17

not rule out that it was "an oddball fly-off medium energy spatter." Regarding the bloodstains to the left of the zipper, Gialamas believed they were transfer stains because the stains went along the rise of three natural creases on that area of the pants, which would mimic spatter stains once flattened out. But he also could not rule out that they were created by spatter because it was remotely possible that the three drops of spatter precisely landed on the crease areas.

Gialamas examined petitioner's shirt and found no evidence of blood spatter. In his opinion, the evidence on petitioner's shirt was more consistent with the wearer's cradling a bloodied head. He also testified that blue cotton is not uncommon, and that cotton is "the most ubiquitous fiber we have."

In sum, Gialamas concluded: "Given the lack of spatter on [petitioner's] clothing, no, I don't think that this clothing is consistent with this individual being the perpetrator."

### III. 2007-2009 HABEAS CORPUS PROCEEDINGS

In 2007, petitioner sought a writ of habeas corpus in the San Bernardino County Superior Court, claiming that his 1997 murder conviction was based on false evidence and that new evidence unerringly established his innocence. Petitioner also presented evidence challenging the blue cotton fibers found under Pamela's fingernail and presenting new DNA evidence taken from the cinder block and from a hair found under one of Pamela's fingernails. (See *Richards I*, *supra*, 55 Cal.4th at pp. 958-959.) But these facts are not related to petitioner's false evidence claim raised in his current petition for writ of habeas corpus. Accordingly, we will focus only on the significance of the prosecution expert's recantation of his trial testimony concerning bite mark evidence.

The 2007 petition included a declaration from Dr. Sperber, the prosecution's forensic dentist at petitioner's jury trial, in which he repudiated his

18

testimony at trial that only 1 or 2 percent of the population had petitioner's dental irregularity. According to Dr. Sperber's declaration: "These percentages were based on my own experience and were not scientifically accurate." He added: "With the benefit of all of the photographs [of the crime scene and Pamela's injuries], and with my added experience, I would not now testify as I did in 1997," and "I cannot now say with certainty that the injury on the victim's hand is a human bite mark injury."

The 2007 petition also included declarations and reports by other experts in the field of forensic dentistry. Dr. Golden, the defense forensic dentist at petitioner's jury trial, declared that he "enlarged the image [of Pamela's hand lesion] to life-size" and that after comparing the enlarged image to petitioner's teeth, he "would tend to exclude [petitioner] as the suspected biter." In his declaration, Dr. Charles M. Bowers described how he and Dr. Raymond J. Johansen had used computer software to remove the angular distortion from the photograph of Pamela's hand lesion, thereby allowing a more accurate comparison between the lesion and petitioner's lower teeth. According to Dr. Bowers's declaration, "The new scientific methods demonstrably contradict the conclusion at trial that [petitioner] could not be ruled out as a suspected biter." Dr. Bowers was also critical of the methodology used by Dr. Sperber at petitioner's trial. In an earlier report, Dr. Bowers wrote that there is "significant doubt that the hand injury is even a bitemark."

After the superior court issued an order to show cause, the court received further briefing and eventually held an evidentiary hearing in 2009 in which the forensic dentists testified consistently with their declarations. In addition to the points made in his posttrial declaration, Dr. Sperber described the angular distortion in the photograph of the lesion on Pamela's hand and stated that he had examined autopsy photographs depicting other lesions on Pamela's body.

Concerning the autopsy photograph of the lesion on Pamela's hand, Dr. Sperber explained: "I don't know for sure that . . . that photograph depicts a bite mark." He added: "My opinion today is that [petitioner's] teeth . . . are not consistent with the lesion on the hand." Dr. Golden also testified consistently with the points in his declaration. He concluded that the lesion was not from petitioner's teeth and speculated that it might have been a dog bite or from some other source.

Drs. Bowers and Johansen both explained how they used computer software to digitally correct the photograph of Pamela's hand by removing angular distortion. They testified that they are experts in this process and have published articles and a book on the digital analysis of bite mark evidence. They explained that the technique was first used in 1996 or 1997 by a doctor in Canada. But Drs. Bowers and Johansen further developed the precision of the technique to correct angular distortion in photographs, and their method has become accepted in the field of forensic dentistry.

After correcting the angular distortion in the autopsy photograph, Dr. Johansen created outlines depicting petitioner's lower and upper teeth. He concluded that petitioner's lower teeth did not match the lesion on Pamela's hand because it was obvious to him "that this mark, if indeed a bite mark, was more likely to have been made by an upper arch." Using an outline of petitioner's upper teeth, Dr. Johansen concluded the upper teeth matched the lesion in some places, but not others. Dr. Johansen could not exclude petitioner's teeth as a possible source of the lesion, but in his opinion it was just as likely that the indistinct lesion was caused by the fencing material under Pamela's right arm as it was by petitioner's teeth. Dr. Johansen conceded, however, that he had removed angular distortion from the same photograph in 2000, and had concluded *at that time* that the lesion was a human bite mark that was consistent with petitioner's teeth.

20

Dr. Bowers testified that he also corrected the angular distortion from the autopsy photograph and compared the corrected photograph to a digital exemplar of petitioner's lower teeth. After superimposing the image of petitioner's lower teeth to the corrected autopsy photograph, he found no match. According to Dr. Bowers, the lesion was 11 millimeters shorter than petitioner's lower teeth, and three of his teeth did not align with the lesion. Dr. Bowers examined photographs of other lesions on Pamela's body that appeared to have been caused by the metal fencing on the ground and doubted whether the hand lesion was a human bite mark, believing that it might have been left by the fencing material under her right arm.

At the conclusion of the hearing, the superior court granted habeas corpus relief, concluding that the new evidence unerringly established petitioner's innocence and ordered that petitioner be remanded for a new trial. The People appealed the trial court's decision and the Court of Appeal, after briefing and argument, vacated the superior court's order granting the petition for a writ of habeas corpus. We granted petitioner's petition for review in 2011.

## IV. THE *RICHARDS I* DECISION

Section 1473, subdivision (b) provides in relevant part: "A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons: [¶] (1) False evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his or her incarceration." If a petitioner fails to show that false evidence affected the outcome of petitioner's trial, a petitioner may present new evidence to challenge the conviction, but in order to prevail, " 'such evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability.' [Citation.]" (*In re Clark*, *supra*, 5 Cal.4th 750, 766.)

21

Prior to 2014, section 1473 did not specifically provide guidance as to the meaning of "false evidence" for purposes of determining falsity, but we interpreted section 1473 to require a petitioner to show that the evidence was false by "a preponderance of the evidence." (*In re Malone* (1996) 12 Cal.4th 935, 962 (*Malone*), citing *In re Sassounian* (1995) 9 Cal.4th 535, 546 [a petitioner " 'bears the burden of proving' " those facts supporting the petition for habeas corpus " 'by a preponderance of the evidence' "].) In *Richards I*, we were presented with the question of alleged falsity concerning expert witness testimony in the context of Dr. Sperber's recanted trial testimony regarding the lesion on Pamela's hand and whether it matched petitioner's teeth. As previously described, in *Richards I* this court split 4 to 3 on the issue of whether petitioner had shown that Dr. Sperber's trial testimony was false evidence within the meaning of section 1473.

The majority in *Richards I* held that if an expert witness's opinion given at trial later changes, without any significant advances in the expert's field of expertise or in any technologies employed by the expert, "it would not be accurate to say that the witness's opinion at trial was *false*." (*Richards I*, *supra*, 55 Cal.4th at p. 963.) The majority reasoned that the fact that an expert recants an opinion given at trial does not necessarily establish that the opinion at trial was false. Instead, the expert's change in opinion "has merely demonstrated the subjective component of expert opinion testimony." (*Ibid*.) The majority concluded that the "false evidence" standard under section 1473 as it then read was satisfied "[i]f, and only if, a preponderance of the evidence shows that an expert opinion stated at trial was objectively untrue." (*Ibid*.)

For purposes of petitioner's case, the majority recognized that new technology that was not available at the time of petitioner's 1997 trial had been applied to remove the angular distortion from the autopsy photograph, but it concluded that the new technology failed to prove "that any portion of Dr.

22

Sperber's trial testimony was objectively untrue." (*Richards I*, *supra*, 55 Cal.4th at p. 965.) The majority explained that petitioner's experts at the habeas corpus hearing had merely cast doubt on Dr. Sperber's trial testimony and that "these experts still could not definitively rule out petitioner's teeth as a possible source of the mark" on Pamela's hand, thus failing to prove that Dr. Sperber's opinion at trial was "objectively untrue." (*Id*. at pp. 965-966, italics omitted.) Accordingly, the majority concluded, petitioner had not shown that Dr. Sperber's testimony was false for purposes of applying the standard of review for false evidence under section 1473. (*Richards I*, at p. 966.) Instead, the majority held that Dr. Sperber's recantation and the evidence presented by the other forensic dentists must properly be reviewed under the more demanding standard applicable to new evidence, and concluded that this new evidence did not " 'unerringly' " establish petitioner's innocence and thus did not support setting aside the challenged conviction. (*Id*. at p. 968, quoting *In re Clark*, supra, 5 Cal.4th at p. 766.)

The dissenting opinion in *Richards I* criticized the majority for treating the recantation of expert testimony differently from the recantation of lay testimony for purposes of section 1473, maintaining that the statute "makes no distinction between lay and expert testimony." (*Richards I*, *supra*, 55 Cal.4th at p. 972 (dis. opn. of Liu, J.).) The dissent noted that prior case law had established that lay testimony can be deemed false merely if the witness recants his or her prior testimony, whether or not other evidence demonstrated "the truth or falsity of the ultimate fact to which the witness testified." (*Id.* at p. 973, citing *In re Hall* (1981) 30 Cal.3d 408 [granting relief where the trial witnesses later recanted their prior eyewitness identification of petitioner as the gunman].) According to the dissent, "[t]here is no reason to treat expert testimony differently" because "[j]ust as the truth or falsity of eyewitness testimony under section 1473(b) depends on the truth or falsity of underlying facts concerning the witness's perceptual abilities, the truth

23

or falsity of expert testimony depends on the truth or falsity of underlying facts essential to the expert's inferential method and ultimate opinion." (*Richards I*, at p. 973.) The dissent further explained that Dr. Sperber's perception of whether petitioner's lower teeth were consistent with the lesion on Pamela's hand was based on an autopsy photograph that had not been corrected for angular distortion. The dissent observed that all of the petitioner's experts on habeas corpus now agreed that the autopsy photograph, when the angular distortion was corrected, either excluded petitioner's teeth as the source of the lesion or was simply too poor to serve as a basis on which to make any conclusion regarding a match. (*Richards I*, *supra*, 55 Cal.4th at pp. 974-975 (dis. opn. of Liu, J.).) According to the dissent, "the critical underlying fact — that the single uncorrected photograph provided Dr. Sperber with a sufficient basis for matching petitioner's teeth to a lesion on the victim's hand — was proven false." (*Id*. at p. 975.) The dissent further asserted that, just as lay eyewitness testimony can be false "because it depended crucially on the witnesses having seen something that it turns out they did not actually see, the expert testimony here was false because it depended crucially on Dr. Sperber having seen something — a true photographic representation of the lesion on the victim's hand — that it turns out he did not actually see." (*Id*. at pp. 975-976.) The dissent concluded that because petitioner had "shown by a preponderance of the evidence that the essential premise of Dr. Sperber's trial testimony was false, it follows that the testimony was false evidence under section 1473(b)." (*Id*. at p. 976.) Applying the standard of review applicable to false evidence under section 1473, the dissent concluded that, because there was a reasonable probability that the false evidence affected the outcome of petitioner's trial, the conviction should be set aside. (*Richards I*, at p. 982 (dis. opn. of Liu, J.).)

24

## V. DISCUSSION

### A. The 2014 revision of the definition of false evidence for purposes of expert opinion under section 1473

After this court's decision in *Richards I*, the Legislature enacted Senate Bill No. 1058 (2013-2014 reg sess.), which added subdivision (e)(1) to section 1473. That provision now states in full: "For purposes of this section, 'false evidence' shall include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." (Pen. Code, § 1473, subd. (e)(1).)

The plain meaning of the amendment to section 1473 makes clear that an expert opinion given at trial can later be deemed "false evidence" under two circumstances: (1) if the expert repudiates his or own opinion given at trial; *or* (2) if the opinion given at trial is undermined by subsequent "scientific research or technological advances." (§ 1473, subd. (e)(1).) We conclude that, under this amendment to section 1473, petitioner has met his burden to show that Dr. Sperber's trial testimony constituted false evidence under either circumstance.

First, Dr. Sperber clearly repudiated his trial testimony. In the habeas corpus proceedings, Dr. Sperber testified that he no longer was certain that the autopsy photograph depicted a human bite mark, stating, "I don't know for sure that . . . that photograph depicts a bite mark." He also repudiated his trial testimony concerning whether petitioner's teeth were consistent with the lesion depicted on the autopsy photograph, stating, "My opinion today is that [petitioner's] teeth . . . are not consistent with the lesion on the hand." Because section 1473 as amended in 2014 states false evidence is established when an expert's trial testimony has "been repudiated by the expert who originally provided the opinion," petitioner has shown through Dr. Sperber's subsequent

25

testimony during the 2009 proceedings on habeas corpus that Dr. Sperber's testimony was false.  (§ 1473, subd. (e)(1).)

Second, the evidence petitioner presented in the prior habeas corpus proceedings also established that new technological advances undermined Dr. Sperber's trial testimony.  Technology that was not available at the time of petitioner's 1997 jury trial was used to correct the angular distortion of the lesion depicted in the autopsy photograph.  That corrected photograph informed the opinions of the experts at the habeas corpus proceedings.

In light of the corrected photograph, Dr. Sperber and Dr. Golden testified that they would exclude petitioner's teeth as the source of the lesion.  Dr. Bowers noted that the length of the lesion in the corrected autopsy photograph was inconsistent with the size of petitioner's lower teeth and that three of petitioner's teeth did not match the lesion, and he expressed doubt whether the lesion was a bite mark at all.  After examining the corrected photograph and photographs of other lesions on Pamela's body, Dr. Johansen testified that, because of the poor quality of the autopsy photograph, he could not include or exclude petitioner's teeth as the source of the mark and that it was just as likely that the lesion was created by the fencing material and not a bite.

As a result, petitioner has shown that Dr. Sperber's trial testimony constituted false evidence because that opinion has "been undermined by later scientific research or technological advances."  (§ 1473, subd. (e)(1).)  The legislative history of the 2014 amendment of section 1473 bolsters our interpretation of that section.  (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120.)

An Assembly committee analysis of Senate Bill No. 1058 stated that the impetus for the bill was the issue addressed in *Richards I, supra*, 55 Cal.4th 948: "The 4-3 majority in Richards held that expert opinion stated at trial is 'false

evidence' supporting . . . habeas relief if the expert's conclusion is proved to be objectively untrue." (Assem. Com. on Public Safety, Analysis of Sen. Bill 1058 (2013-2014 Reg. Sess.), as amended June 4, 2014, p. 5 (Assembly Analysis).) The analysis included a detailed summary of the facts of the case, described the positions of the majority and dissent, and concluded by stating:

"This bill specifies that 'false evidence' for purposes of prosecuting a writ of habeas corpus, includes opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances. This bill removes the distinction between testimony by lay witnesses and testimony of experts created by the *Richards* decision but still requires that the court make a finding that it is reasonably probable that the verdict at trial would have been different without the expert's testimony before granting habeas relief." (Assem. Analysis, *supra*, at pp. 8-9.)

Similarly, a Senate committee analysis of Senate Bill No. 1058 stated:

"The issue this bill seeks to address was clearly depicted in the California Supreme Court case, In Re Richards, 55 Cal.4th 948 (2012). The Richards 4-3 majority upheld petitioner's conviction, holding that 'expert testimony' is different from other types of testimony in that it is merely the opinion of the expert, not evidence in and of itself, and so can never be 'true' or 'false.' Because of this, the court found Richards had failed to establish the falsity of the original expert testimony, which had served as the basis for his conviction. The Richards dissent, written by Justice Liu, pointed out the injustice of the majority opinion; noting that the false evidence statute Penal Code Sec. 1473(b), used by the majority, did not make a distinction between lay and expert testimony, but that the majority's opinion placed a heavier burden on any petitioner seeking relief from false evidence presented by expert testimony. Liu noted that there is no reason to treat

27

the two types of testimony differently because, just as the truth or falsity of the eyewitness testimony under [Section] 1473(b) depends on the truth or falsity of the underlying facts concerning their perceptual abilities, so too does the truth or falsity of the expert's testimony depend on the underlying facts essential to the expert's inferential method and opinion." (Sen. Rules Com., third reading analysis of Sen. Bill No. 1058 (2013-2014 Reg. Sess.), as amended June 4, 2014, p. 3.)

From this legislative history, it is apparent that the Legislature agreed with the dissent's conclusion in *Richards I, supra*, 55 Cal.4th 948. The Senate committee analysis supports the notion that the Legislature intended courts to treat lay and expert opinion equally in determining whether the testimony of an expert witness at trial satisfies the false evidence language of section 1473.

Accordingly, we conclude that petitioner has shown that Dr. Sperber's trial testimony that the lesion on Pamela's hand was consistent with the assertedly unusual dentition of petitioner's lower teeth constituted "false evidence" within the meaning of section 1473 as amended in 2014.

### B. False evidence and the sufficiency of the evidence

The San Bernardino County District Attorney does not extensively discuss whether Dr. Sperber's trial testimony constitutes false evidence for purposes of section 1473. Rather, the district attorney primarily argues that petitioner's claim of false evidence concerning Dr. Sperber's trial testimony is an attempt to present a sufficiency of the evidence claim, which is a type of claim not cognizable on a petition for writ of habeas corpus. (See *In re Lindley* (1947) 29 Cal.2d 709, 723 ["Upon habeas corpus, . . . the sufficiency of the evidence to warrant the conviction of the petitioner is not a proper issue for consideration"].) The district attorney contends that petitioner's claim is not cognizable because if Dr. Sperber's trial testimony is eliminated from consideration, the remainder of the evidence

28

admitted against petitioner must be considered in evaluating his guilt and such reweighing of the evidence would amount to nothing more than a sufficiency of the evidence claim.

This contention is based on a misunderstanding of the standard that section 1473 establishes for determining when relief on habeas corpus is available upon a showing that false evidence was admitted at trial. The statute and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under 1473 as long as the false evidence was "material." Our case law further explains that false evidence is material " 'if there is a 'reasonable probability' that, had it not been introduced, the result would have been different.' " (*In re Roberts* (2003) 29 Cal.4th 726, 742.) The remedial purpose of the statute is to afford the petitioner relief if the "false evidence [was] of such significance that it may have affected the outcome of the trial . . . ." (*In re Wright* (1978) 78 Cal.App.3d 788, 808-809.) Thus, the crucial question is whether the false evidence was material — not whether, without the false evidence, there was still substantial evidence to support the verdict.

Our courts have held that " '[f]alse evidence is "substantially material or probative" if it is "of such significance that it may have affected the outcome," in the sense that "*with reasonable probability* it *could* have affected the outcome . . . ." [Citation.] In other words, false evidence passes the indicated threshold if there is a "reasonable probability" that, had it not been introduced, the result would have been different. [Citation.] The requisite "reasonable probability," we believe, is such as undermines the reviewing court's confidence in the outcome.' " (*Malone*, *supra*, 12 Cal.4th at p. 965 (*Malone*), quoting *In re Wright, supra*, 78 Cal.App.3d 788, 814, italics added by *Malone*.) This required showing of prejudice is the same as the reasonably probable test for state law error established

under *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*Wright*, *supra*, 78 Cal.App.3d at p. 812.)  We make such a determination based on the totality of the relevant circumstances.  (*Malone*, *supra*, 12 Cal.4th at p. 965.)

Accordingly, we will apply this standard to determine whether the false evidence was substantially material and probative on the issue of petitioner's guilt.

## C.  Reasonable probability that the false evidence affected the outcome

Dr. Sperber's qualifications were impressive.  At the time of petitioner's 1997 jury trial, Dr. Sperber had more than 40 years of experience in dentistry, which included being the chief forensic dentist for two counties.  He had testified in more than 100 cases, including well-known high profile cases.  He also received a congressional appointment to set up a national system to identify missing persons through dental records.  Dr. Sperber's credentials very likely added to the credibility of his testimony.

It is important to note that Dr. Sperber not only testified that he believed the lesion on Pamela's hand was consistent with the unusual dentition of petitioner's lower teeth, he also prepared an exhibit.  On a poster board, Dr. Sperber assembled an enlarged photo of the autopsy photograph depicting Pamela's lesion, a photo of petitioner's lower jaw casting, and a transparency tracing of petitioner's lower canine and incisor teeth.  He taped the transparency between the two photos so that the transparency tracing could be flipped back and forth between the two photos for purposes of visualizing the match.  This exhibit and the casting of petitioner's teeth  were admitted in evidence and given to the jury during its deliberations.

Although in *Richards I, supra*, 55 Cal.4th 948, we characterized the evidence against petitioner as strong, we did so in the context of whether the evidence was strong enough to overcome any suggestion that evidence

discrediting Dr. Sperber's conclusion pointed "unerringly" to petitioner's innocence. Now, however, we must decide whether the evidence is strong enough to rule out a reasonable probability that the admission of Dr. Sperber's trial testimony affected the outcome of the case. In that context, the case against petitioner was entirely based on circumstantial evidence, and much of that evidence was heavily contested. Upon examination of this circumstantial evidence admitted against petitioner, it appears that Dr. Sperber's testimony was "material" for purposes of section 1473.

Assuming that, like the prosecution's investigator, petitioner was able to drive 20 miles per hour over the speed limit on the night of the killing, petitioner would have had anywhere from only eight to 11 minutes to kill the victim, depending on whether Eugene Price's phone call or petitioner's first call to 911 is used as the time reference for when the attack on Pamela was completed. If petitioner drove 10 miles per hour over the speed limit on his way home that night, then he would have had anywhere from only one to four minutes to kill the victim. According to the county's chief medical examiner, Dr. Sheridan, death by strangulation alone can take anywhere from two and a half to three minutes.

Although some parts of the property contained looser soil that was amenable to shoe prints, the fact that shoe prints of only the victim and petitioner were found at the crime scene is not remarkable, given that some of the landscape was generally not conducive to creating shoe prints. In fact, only four shoe prints were found at the crime scene, with three of them belonging to Pamela — despite evidence that she was chased around the crime area.

Petitioner's familiarity with the crime scene and with what items were used to strike Pamela may appear suspicious in the abstract, but he had had to wait for more than a half-hour before Deputy Nourse arrived. It is not unreasonable to conclude that petitioner, while waiting for the police to arrive, explored the area to

determine how his wife died.  Moreover, when Detective Parent examined the crime scene, it was readily apparent to him that both the cinder block and stone had been used to hit Pamela in the head because those items were covered with blood and blood spatter.  In fact, he agreed that it did not take a "rocket scientist" for someone to make such a conclusion.

The time of death was a significant issue at trial.  It is undisputed that there was no evidence definitively establishing that point.  But evidence suggested that Pamela stopped answering her phone hours before petitioner arrived.  Although Deputy Nourse, upon examining Pamela's body, believed she had very recently died because the body still had wet puddled blood around it and no rigor mortis, he described her body as neither warm nor cold.  Both the prosecution and defense forensic pathologists agreed that, after death, the body cools at a rate of 1.5 degrees to 2 degrees Fahrenheit per hour with some variance depending on the environmental conditions, the weight of the body, and the circumstances leading to death.  Thus, if Pamela had died an hour before petitioner arrived, Deputy Nourse's observation that her body was neither warm nor cold might be consistent with that hypothesis because he arrived less than an hour after petitioner did.

The fact that there were no visible, fresh injuries on petitioner's face, arms, and hands on the night of the killing was also unusual.  The scene of the crime established that Pamela fought her attacker.  Two of her fingernails were torn off during the attack.  Her body had numerous pre-mortem bruises and lacerations. There was evidence she was assaulted outside first and then brought inside the camper where she bled on pillows.  Pamela was strangled first by ligature and then manually.  The presence of blood in multiple locations further suggested that Pamela tried to fight off and flee her attacker.  However, petitioner's body showed no evidence of a recent physical altercation.

32

Even more unusual was the evidence of blood on petitioner's clothing. The few stains that the prosecution's expert identified as blood spatter on petitioner's shoes and jeans were millimeter sized. But the area around Pamela's body exhibited a radial spray of significant blood spatter, much of which was centimeter sized. More important, the defense expert provided evidence that the alleged blood spatter on petitioner's jeans and shoes could have been the result of transfer scenarios that were consistent with petitioner's claim that he had cradled Pamela's head at the scene. The expert believed the assailant's clothes would have displayed far more blood spatter than was found on the clothing petitioner wore on the night of the killing. As a result, the defense expert believed that petitioner's clothing was not consistent with his being the perpetrator.

Accordingly, with the exception of the bite mark evidence, the defense had a substantial response to much of the prosecution's evidence against petitioner. Under these unique circumstances, it is reasonably probable that the false evidence presented by Dr. Sperber at petitioner's 1997 jury trial affected the outcome of that proceeding.

## VI. DISPOSITION

The petition for writ of habeas corpus is granted.[4]  The judgment of the San Bernardino County Superior Court in *People v. William Richards*, No. SWHSS700444, is vacated.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

---

[4]     On November 6, 2015, petitioner filed a motion for release on unscheduled bail amount or own recognizance pending determination on merits of petition for writ of habeas corpus and a motion to expedite case and for calendar preference. In light of the disposition of the petition for writ of habeas corpus, both are dismissed as moot.

**CONCURRING OPINION BY CORRIGAN, J.**

I concur in the majority opinion but write separately to address the observations put forward in the concurring opinion of my colleague. The separate opinion emphasizes the "relevance" of the fact that two previous juries were unable to reach a verdict without the bite mark evidence. (Conc. opn. of Liu, J., *post*, at p. 1.) To conclude that the case is weak merely because a jury, or even two, did not return a verdict is often an exercise in speculation.

Our role as a reviewing court is to determine whether the false evidence admitted in this case was " 'material,' " a standard equivalent to the "reasonably probable test for state law error" under *People v. Watson* (1956) 46 Cal.2d 818. (Maj. opn., *ante*, at p. 29.) Under that standard, we must "examine 'each individual case to determine whether prejudice *actually occurred in light of the entire record.*' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801-802, italics added.) Prejudice must appear as a " 'demonstrable reality,' not simply speculation." (*People v. Williams* (1988) 44 Cal.3d 883, 937.) The majority opinion aptly identifies several facts in the record that show a reasonable probability defendant suffered prejudice from admission of the bite mark evidence. (Maj. opn., *ante*, at pp. 30-33.)

By contrast, it is very difficult to read any significance into the fact that two other juries hung in this case. Juries fail to agree for a variety of reasons and the rules of evidence prohibit inquiry into the jurors' subjective reasoning process. (Evid. Code, § 1150, subd. (a).) Particularly when the split is 11 to one, as it was in the second trial here, the disagreement may be driven as much by the

personality of a juror, a uniquely held world view, or even some friction during deliberations, as by any weakness in the underlying case. The point is that, in most cases, a reviewing court, writing at a great remove from trial proceedings, may seldom know why a jury did not reach consensus. Such is the case here.

My colleague accepts defendant's assertion that " 'the difference between the first two unsuccessful trials and the third trial was the introduction of bite mark evidence through Dr. Sperber.' " (Conc. opn. of Liu, J., *post*, at p. 3.) However, complete records of the first two trials are not before us, and the record that we do have shows the assertion is inaccurate, to say the least. Defendant testified in his own defense in the first two trials. He did not do so here. Of course, the last jury could not draw any negative inference from his failure to testify and there is nothing in this record to indicate why that choice was made. The fact remains that, in the first two trials, those juries received different evidence, and heard it from defendant himself. The availability of that testimony may have swayed some dissenting jurors in his favor.

In addition, the minute orders from the first two trials were made a part of this habeas corpus petition record.[1] A comparison of all three sets of minute orders reveals that there were a total of 37 witnesses called at all three trials, 21 on behalf of the prosecution and 16 called exclusively by the defense. But only 12 of these witnesses testified at all three trials, 10 for the prosecution and two for the defense. In terms of prosecution witnesses, Robert Fenstermacher, Buster Price, Alvera Price, and Marie Starg testified only at the first trial; Kathy Sue Blades and Rosalin Scamihorn only at the second. Hobart Gray, Valerie Seleska, and Dr. Norman Sperber were called only in the last trial. Craig Ogino did not testify at

---

[1]     There was actually an additional trial which was begun after the first mistrial. That case was mistried because the trial judge recused herself during voir dire. (*In re Richards* (2012) 55 Cal.4th 948, 955.) In discussing the three trials here, I refer to the three times the case was given to a jury to decide.

the first trial but did at the second and third. For the defense, Mike Au, Pedro Galvan, Michael Stansell, and Allen Walkner testified only at the first trial; Tom Bradford and Norman Parent only at the second.[2] Christian Filipiak, Robert Gager, Dr. Gregory Golden, Wayne Kozica, Gregory Randolph, Jean Paul Rios, and Dr. Griffith Thomas were never heard by the two hung juries, testifying only at trial three. As noted, defendant testified only at the first two trials.

Although the substance of the testimony at the first two trials is not available for our review, it is clear each case was tried with *substantially* different sets of witnesses. Defendant was represented by the public defender in the first two trials, and by privately retained counsel in the third. One judge presided over the first trial, and a different judge presided over the second and third. We cannot know whether there were significant differences in evidentiary rulings made in each case. We cannot know how the first two cases were argued by different counsel or whether the theory or nuances of those cases differed from either the prosecution or defense perspective.

I do not suggest that we can conclude that those differences, and others that may have flowed from them, influenced the outcome here. The pivotal point is that we do not know. I strongly urge that we cannot and should not speculate about the import of the fact that two other juries failed to reach consensus, particularly when so many factors can lead to such a result, and when the trials were so demonstrably different.

My colleague asserts that we "do know" the prosecution here "never meaningfully disputed Richards's observation that the bite mark evidence was a material difference" among the trials. (Conc. opn. of Liu, J., *post*, at p. 2.) First, as noted, that is simply not the case as to the main evidentiary difference. Second, it misstates the People's position.

---

[2] Bradford and Parent also testified for the prosecution in all three trials.

In their return to the habeas corpus petition, the People affirmatively "deny each and every allegation of the Petition," except as stated otherwise. In the briefing at issue here the focus was always the bite mark evidence. The People properly concentrated their argument on that question. They had no reason to wander far afield arguing at length about the strength of cases not under review. As the People point out in their briefing, this petition rests solely on a statutory change. They clearly state their position that "[t]he only relevant analysis is whether the changes to Penal Code [section] 1473 require relief here." In their return the People refer to the great body of evidence they assert points to defendant's guilt, and note that that evidence relates to other aspects of the case that have been "repeatedly parsed throughout numerous appeals and petitions." It is a substantial overreach to suggest the People concede a point they explicitly deny, particularly to imply they acknowledge weakness in a case they have strongly pursued for over 20 years.

My colleague cites other cases in which the fact of prior hung juries was recognized as "relevan[t]." (Conc. opn. of Liu, J., *post*, at pp. 1-2.) *People v. Gonzalez* (2006) 38 Cal.4th 932 was a death penalty case in which the first jury convicted the defendant of multiple murders but hung on the penalty question. A second jury returned a death verdict. (*Id*. at p. 938.) The court held that the prosecution improperly failed to provide discovery of rebuttal evidence in the second penalty trial, prejudicing the defendant. (*Id*. at pp. 955, 957, 961-962.) The court's discussion reveals that it was able to compare the evidence from the first and second penalty trials in a number of particulars. The same counsel participated in both penalty phases, which were apparently tried before the same judge. (*Id*. at pp. 961-962.) In reversing, we observed that "a death verdict was not a foregone conclusion. Indeed, the first penalty trial ended with a hung jury." (*Id*. at p. 962.) Of course, a death verdict is never a "foregone conclusion" because the penalty decision is normative. Even if all jurors agree that the evidence shows the aggravating circumstances outweigh the mitigating, they

4

remain free to return a verdict for a life sentence if they conclude death is not appropriate. (*People v. Page* (2008) 44 Cal.4th 1, 55-56.) The observation that a death sentence was not a foregone conclusion does little to support an argument that a prior hung jury in the guilt phase is strong evidence of a weak factual case.

In *People v. Kelley* (1967) 66 Cal.2d 232, we found the trial court erred in admitting evidence of the defendant's unlawfully obtained confessions to uncharged sexual acts as circumstantial proof that he committed the charged offenses. (*Id*. at pp. 236-251.) In assessing prejudice, we noted "that at the first trial when such evidence was excluded the jury was unable to agree but at this trial when the evidence was admitted a unanimous verdict resulted." (*Id*. at p. 245.) We found this fact relevant given that the two trials were "otherwise substantially similar." (*Ibid.*; accord *People v. Diaz* (2014) 227 Cal.App.4th 362, 385.) As noted, defendant has failed to make such a showing here.

*Kyles v. Whitley* (1995) 514 U.S. 419 was also a death penalty case. There the original jury hung as to guilt and a second jury convicted and returned a death judgment. (*Id*. at p. 421.) The case was reversed for significant *Brady* violations (*Brady v. Maryland* (1963) 373 U.S. 83). (*Kyles*, at pp. 441-454.) The court had before it an extensive evidentiary record, produced in connection with habeas corpus review, allowing a comparison of the evidence presented and the theories relied upon in each trial. (*Id*. at pp. 429-431.) Justice Stevens wrote separately in response to a four-justice dissent. Even Justice Stevens's opinion, joined in by two other justices, cannot be fairly said to support a reliable conclusion that a hung jury means the factual case is weak. (*Id*. at p. 455 [conc. opn. of Stevens, J.].) Indeed, as the majority noted, "Because the State withheld evidence, its case was much *stronger*, and the defense case much *weaker*, than the full facts would have suggested." (*Id*. at p. 429, italics added.) Justice Stevens's concurrence merely relied on the previous hung jury as one factor in concluding the *Brady* errors were prejudicial. (*Id*. at p. 455 [conc. opn. of Stevens, J.].)

My colleague also cites cases from federal courts of review and the states of Georgia and Massachusetts.  Those cases are not binding precedent, and my colleague does not suggest otherwise.  It appears that in most of those cases the courts had far more complete records of all proceedings involved.  They did not draw speculative conclusions as to the strength of a case from the mere fact of a hung jury.[3]

I am not suggesting that a full record can never provide sufficient evidence for a reviewing court to make a proper evaluation of the strength of cases as presented.  I do counsel that courts should be hesitant to label a case weak due to a hung jury in a previous case, the record of which is not before them.

**CORRIGAN, J.**

---

[3]     The exception is *Commonwealth v. Broomhead* (Mass.App.Ct. 2006) 855 N.E.2d 413, a driving under the influence case.  The court reversed for violation of a state rule of criminal procedure.  (*Id*. at p. 417.)  There the court did conclude the case was a close one, because two previous juries had hung and the final jury had sent out a note asking what would happen if it could not agree on a verdict.  (*Id*. at p. 420.)  The case does not reveal how the previous juries were divided, nor does it discuss the possible differences in evidence or theories presented.  The paucity of information makes it difficult to evaluate whatever persuasive value the case may have.

**CONCURRING OPINION BY LIU, J.**

I join today's opinion, including its determination that it is reasonably probable that the false evidence presented by Dr. Norman Sperber at petitioner William Richards's 1997 jury trial affected the outcome of that proceeding. The bite mark evidence falsely established "a direct and visceral link" between Richards and the victim (*In re Richards* (2012) 55 Cal.4th 948, 981 (*Richards I*) (dis. opn. of Liu, J.)), and the remaining evidence was too close for us to have confidence in the verdict (maj. opn., *ante*, at pp. 30–33).

In assessing the significance of the bite mark evidence, I think it is also relevant that two previous juries were unable to reach a verdict without this evidence. It was only at the final trial, where the false evidence was admitted, that a jury convicted Richards. In similar circumstances, this court and others have recognized the relevance of prior hung juries to the determination of prejudice. (See, e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 962 [concluding that the improper denial of discovery of rebuttal evidence in a penalty retrial was prejudicial because it was reasonably possible that defense counsel would have presented mitigating evidence and the first jury hung when such evidence was admitted]; *People v. Kelley* (1967) 66 Cal.2d 232, 245 [finding it significant that the first jury was unable to agree when the disputed evidence was excluded, but a unanimous verdict resulted when the evidence was erroneously admitted at the later trial]; *People v. Diaz* (2014) 227 Cal.App.4th 362, 385 [a previous hung jury

"supports a finding of prejudice in light of the fact that the evidence presented at both trials was similar, with the significant exception that the [improperly admitted] videos were *not* shown at the first trial"]; *Kyles v. Whitley* (1995) 514 U.S. 419, 455 (conc. opn. of Stevens, J.) ["the fact that the jury was unable to reach a verdict at the conclusion of the first trial provides strong reason to believe the significant errors that occurred at the second trial were prejudicial"]; *Ouber v. Guarino* (1st Cir. 2002) 293 F.3d 19, 35 [finding that defense counsel's failure to present the repeatedly promised testimony of petitioner was prejudicial because the only "salient difference" between the petitioner's third trial and the previous trials was the absence of petitioner's testimony]; *Perry v. United States* (D.C. 2011) 36 A.3d 799, 821 [finding erroneous jury instruction to be prejudicial where previous jury deadlocked without such instruction]; *Bass v. State* (Ga. 2009) 674 S.E.2d 255, 258 ["A prior hung jury is a factor this Court has recognized in addressing the prejudice prong of an ineffectiveness claim."]; *Com. v. Broomhead* (Mass.App.Ct. 2006) 855 N.E.2d 413, 420 [finding prosecutor's erroneous statements to be prejudicial at third trial where presentation of the same evidence, without the statements, resulted in two prior hung juries].)

Justice Corrigan argues that "it is very difficult to read any significance into the fact that two other juries hung in this case." (Conc. opn. of Corrigan, J., *ante,* at p. 1.) Noting various differences among the three trials, she says we cannot know whether these differences influenced the outcomes in the three proceedings. (*Id.* at pp. 2–3.) What we do know, however, is that the San Bernardino County District Attorney, whose office has litigated this case throughout the trial and appellate levels, has never meaningfully disputed Richards's observation that the bite mark evidence was a material difference between the final trial and the first two trials.

In his opening brief in *Richards I*, Richards observed that in each trial "the prosecution relied on blood spatter evidence, the absence of evidence indicating the presence of a third party at the crime scene, the tuft of blue fibers found in a crack of Pamela's fingernail which was similar to the fibers in a shirt that Richards had worn on the night of the murder, and evidence of some marital discord.  It was not until the third full trial that the prosecution, for the first time, introduced evidence suggesting Richards was responsible for a bitemark found on Pamela and that only 2% of the population had a dentition which could have made that bitemark.  That trial resulted in Richards' conviction."  In his most recent petition, he again noted that "the difference between the first two unsuccessful trials and the third trial was the introduction of bite mark evidence through Dr. Sperber." The District Attorney's office has not specifically contested these assertions, even as it has vigorously opposed reversal of Richards's conviction.  If the three trials had differed in material respects other than the bite mark evidence, one would have expected to see this argument made in the course of multiple rounds of briefing by the party with the knowledge and incentive to make it.

In sum, the fact that two prior juries hung without the bite mark evidence further suggests that admission of this evidence at the third trial was prejudicial, and I join the court in holding that Richards's conviction must be reversed.

LIU, J.

3

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Richards on Habeas Corpus

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S223651
**Date Filed:** May 26, 2016

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Margaret Powers

_____

**Counsel:**

California Innocence Project, Jan Stiglitz, Justin Brooks and Alexander Simpson for Petitioner.

Steven F. Napolitano, Edward L. Tulin; Richard A. Schwartz, Jeffrey B. White; and Barry C. Scheck for Innocence Project, Inc., as Amicus Curiae on behalf of Petitioner.

David L. Faigman for Thomas Albright, Thomas L. Bohan, Barbara E. Bierer, Michael Bowers, Mary A. Bush, Peter J. Bush, Arturo Casadevall, Simon A. Cole, M. Bonner Denton, Shari Seidman Diamond, Rachel Dioso-Villa, Jules Epstein, Lisa Faigman, Stephen E. Fienberg, Brandon L. Garrett, Paul C. Giannelli, Henry T. Greely, Edward Inwinkelried, Allan Jamieson, Karen Kafadar, Jerome P. Kassirer, Jonathan "Jay" Koehler, David Korn, Jennifer Mnookin, Alan B. Morrison, Erin Murphy, Nizam Peerwani, Joseph L. Peterson, D. Michael Risinger, Michael J. Saks, George F. Sensabaugh,. Jr., Clifford Spiegelman, Hal Stern, William C. Thompson, James L. Wayman, Sandy Zabell and Ross E. Zumwalt as Amici Curiae on behalf of Petitioner.

Michael A. Ramos, District Attorney, and Stephanie H. Zeitlin, Deputy District Attorney, for Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jan Stiglitz
California Innocence Project
225 Cedar Street
San Diego, CA  92101
(619) 515-1525

Stephanie H. Zeitlin
Deputy District Attorney
303 W. Third Street, Fifth Floor
San Bernardino, CA  92415-0511
(909) 382-7735